**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Carolyn Lee Hunt

    v.                                                Civil No. 16-cv-159-LM
                             Opinion No. 2016 DNH 217
Carolyn W. Colvin, Acting
Commissioner, Social
Security Administration


### O R D E R

Pursuant to 42 U.S.C. § 405(g), Carolyn Hunt moves to reverse the Acting Commissioner's decision to deny her applications for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income, or SSI, under Title XVI, 42 U.S.C. § 1382. The Acting Commissioner, in turn, moves for an order affirming her decision. For the reasons that follow, this matter is remanded to the Acting Commissioner for further proceedings consistent with this order.

### I. Standard of Review

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of

> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g) (setting out the standard of review for DIB
decisions); see also 42 U.S.C. § 1383(c)(3) (establishing §
405(g) as the standard of review for SSI decisions).  However,
the court "must uphold a denial of social security . . .
benefits unless 'the [Acting Commissioner] has committed a legal
or factual error in evaluating a particular claim.'" Manso-
Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per
curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

     As for the statutory requirement that the Acting
Commissioner's findings of fact be supported by substantial
evidence, "[t]he substantial evidence test applies not only to
findings of basic evidentiary facts, but also to inferences and
conclusions drawn from such facts." Alexandrou v. Sullivan, 764
F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner,
360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial
evidence is 'more than [a] mere scintilla.  It means such
relevant evidence as a reasonable mind might accept as adequate
to support a conclusion.'" Currier v. Sec'y of HEW, 612 F.2d
594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402
U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the
[Acting Commissioner] to determine issues of credibility and to

2

draw inferences from the record evidence.  Indeed, the
resolution of conflicts in the evidence is for the [Acting
Commissioner], not the courts." Irlanda Ortiz v. Sec'y of HHS,
955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations
omitted).  Moreover, the court "must uphold the [Acting
Commissioner's] conclusion, even if the record arguably could
justify a different conclusion, so long as it is supported by
substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529,
535 (1st Cir. 1988) (per curiam).  Finally, when determining
whether a decision of the Acting Commissioner is supported by
substantial evidence, the court must "review[] the evidence in
the record as a whole." Irlanda Ortiz, 955 F.2d at 769 (quoting
Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## II. Background

The parties have submitted a Joint Statement of Material
Facts.  That statement, document no. 13, is part of the court's
record and will be summarized here, rather than repeated in
full.

Hunt filed applications for DIB and SSI on January 3, 2013,
claiming to have become disabled on December 22, 2012.  In her
applications, she identified the following medical conditions as
limiting her ability to work: fibromyalgia, fatigue, spinal
issues, arthritis, and carpel tunnel syndrome in both hands.

Hunt has been diagnosed with a variety of physical and mental conditions including: adjustment disorder, depression, posttraumatic stress disorder ("PTSD"), brain injury, narcolepsy, degenerative disk and degenerative joint disease of the cervical spine, cervical spondylosis with myelopathy, carpal tunnel syndrome of both hands, polyarthralgia,[1] paresthesia,[2] tremor, generalized muscle weakness, myopathy not otherwise specified,[3] persistent hypersomnia, snoring, post concussive syndrome, obstructive sleep apnea, insomnia, chronic musculoskeletal pain, and fibromyalgia.

"Fibromyalgia is a disorder of unknown cause characterized by chronic widespread aching and stiffness." Stedman's, supra note 1, at 725.  In addition, fibromyalgia is "[u]sually associated [with] fatigue, a sense of weakness or inability to perform certain movements, paresthesia, difficulty sleeping, and headaches."  Id.  Finally:

---

[1] Polyarthralgia is "arthralgia in many different joints." Dorland's Illustrated Medical Dictionary 1487 (32nd ed. 2012). Arthralgia is "[p]ain in a joint."  Stedman's Medical Dictionary 159 (28th ed. 2006).

[2] Paresthesia is "[a] spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking); may be due to lesions of both the central and peripheral nervous systems." Stedman's, supra note 1, at 1425.

[3] Myopathy is "[a]ny abnormal condition or disease of the muscular tissues."  Stedman's, supra note 1, at 1274.

> The American College of Rheumatology has established
> diagnostic criteria that include pain on both sides of
> the body, both above and below the waist, as well as
> in an axial distribution (cervical, thoracic, lumbar
> spine, or anterior chest).  Additionally, point
> tenderness must be found in at least 11 of 18
> specified sites.

Id.

In February 2013, Hunt's primary care provider, Dr. David

Nelson, referred Hunt to Dr. Julia Bolding, a rheumatologist, to

confirm his diagnosis of fibromyalgia.  See Administrative

Transcript (hereinafter "Tr.") 419.  Under the heading

"Assessments," Dr. Bolding wrote:

> 1. Fibromyalgia – 7.29.1 (Primary), > 11 of 18
> [fibromyalgia] tender points positive, central pain
> amplification seems to be the primary issue for her.
> She states she wants diagnosis confirmed for
> Disability.  As I understand it, her disability is
> felt to be related to cognitive impairment from a
> closed head injury and fibromyalgia.  I do not know
> what percentage each diagnosis is felt to be
> contributing to her disability, but I do not consider
> fibromyalgia an appropriate reason for disability.
> Data has shown that patients with fibromyalgia do
> better if they remain in the workforce.

Tr. 421.

With respect to Hunt's physical residual functional

capacity ("RFC"),[4] the record includes three opinions: (1) an RFC

assessment by Dr. Jonathan Jaffe, a state agency medical

---

[4] "Residual functional capacity" is a term of art that means
"the most [a claimant] can still do despite [her] limitations."
20 C.F.R. §§ 404.1545(a)(1) & 416.945(a)(1).

consultant who reviewed Hunt's medical records, but did not examine or treat her; (2) a Functional Capacity Evaluation ("FCE") Summary prepared by Catherine Colby (a physical therapist) and Hilary Bradshaw (an occupational therapist); and (3) a Fibromyalgia Medical Source Statement completed by Dr. Nelson.  The court describes each opinion in turn.

In his RFC assessment, Dr. Jaffe opined that Hunt could: (1) lift and/or carry 20 pounds occasionally and 10 pounds frequently; (2) stand and/or walk (with normal breaks) for about six hours in an eight-hour workday; (3) sit (with normal breaks) for about six hours in an eight-hour workday; and (4) push and/or pull the same amounts she could lift and/or carry.  With regard to postural limitations, Dr. Jaffe opined that Hunt could frequently balance and could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; stoop; kneel; crouch; and crawl. He identified no manipulative, visual, communicative, or environmental limitations.

In their FCE Summary, Colby and Bradshaw opined that Hunt could lift: (1) 20 pounds infrequently and 10 pounds frequently, from floor to knuckle; and (2) 15 pounds infrequently and 10 pounds frequently from knuckle to shoulder height, and from shoulder height to overhead.  They also opined that Hunt had no problems with sitting, standing, walking, or climbing stairs.

6

Finally, in his Fibromyalgia Medical Source Statement, Dr. Nelson stated that Hunt's fibromyalgia had lasted or could be expected to last at least twelve months, and gave the following prognosis: "Poor – doubt she will recover/improve."  Tr. 617. Regarding Hunt's functional limitations in a work setting, Dr. Nelson opined that she: (1) did not "have the stamina and endurance to work an easy job 8 hours per day 5 days per week (with normal breaks every two hours)," id.; (2) would need to take unscheduled breaks at least hourly due to muscle weakness, chronic fatigue, pain, paresthesia, and numbness; (3) could not tolerate prolonged sitting; (4) was likely to be off task at least 25 percent of a typical workday; (5) was likely to experience good days and bad days; and (6) was likely to be absent from work more than four days per month due to her fibromyalgia or treatment for it.

With respect to Hunt's mental RFC, the record includes four opinions: (1) a Mental Health Evaluation report prepared by Dr. Trina Jackson, after she performed a consultative examination; (2) a mental RFC assessment by Dr. Craig Stenslie, a state agency psychological consultant who reviewed Hunt's medical records, but did not examine or treat her; (3) a Medical Source Statement of Ability to Do Work-Related Activities (Mental) completed by Dr. Nelson; and (4) a Mental Impairment

Questionnaire completed by Dr. Erinn Fellner, who had seen Hunt

in May 2014, on a referral from Dr. Nelson.  Again, the court

describes each opinion in turn.

After performing a consultative examination, Dr. Jackson

diagnosed Hunt with PTSD and major depressive disorder.  In her

report, she described Hunt's current level of functioning in

five areas, two of which are relevant to the issues before the

court:

> Understanding and Remembering Instructions:
> . . .  Ms. Hunt's memory appears to be intact overall,
> though she may notice specific declines.  She reported
> that her cognitions become fuzzy in the afternoon,
> which is normal given her history of brain injury and
> TBIs.[5]  Based on the available evidence and in my
> clinical opinion, she is <u>able</u> to function
> appropriately, independently, effectively, and
> consistently in the morning, though she is <u>unable</u> to
> do so later in the afternoon.
>
> Concentration and Task Completion:  . . .  Ms.
> Hunt's concentration and attention appeared intact,
> but again are likely negatively impacted by the early
> afternoon.  Based on the available evidence and in my
> clinical opinion, she is <u>able</u> to function
> appropriately, independently, effectively, and
> consistently in this domain, though she is <u>unable</u> to
> do so later in the afternoon.

Tr. 317 (emphasis in the original).

In his mental RFC assessment, Dr. Stenslie opined that Hunt

had no limitations on her ability to understand and remember and

---

[5] TBI is an abbreviation for "traumatic brain injury."
<u>Dorland's</u>, <u>supra</u> note 1, at 1874.

had no social interaction limitations.  With regard to sustained
concentration and persistence, Dr. Stenslie opined that Hunt was
not significantly limited in five of eight listed abilities, but
was moderately limited in her abilities to: (1) carry out
detailed instructions; (2) perform activities within a schedule,
maintain regular attendance, and be punctual within customary
tolerances; and (3) complete a normal workday and workweek
without interruptions from psychologically-based symptoms and to
perform at a consistent pace without an unreasonable number and
length of rest periods.  With regard to adaptation, Dr. Stenslie
opined that Hunt was not significantly limited in three of four
listed abilities, but was moderately limited in her ability to
respond appropriately to changes in the work setting.

In his Medical Source Statement (Mental), Dr. Nelson opined
that Hunt had mild limitations in five of ten listed abilities
(understanding and remembering simple instructions, carrying out
simple instructions, interacting appropriately with the public,
interacting appropriately with supervisors, and interacting
appropriately with co-workers), moderate limitations in two
abilities (making judgments on simple work-related decisions and
responding appropriately to usual work situations and to changes
in a routine work setting), and marked limitations in three
abilities (understanding and remembering complex instructions,

carrying out complex instructions, and making judgments on complex work-related decisions).

In her Mental Impairment Questionnaire, Dr. Fellner opined that Hunt had mild limitations in three of sixteen mental abilities and aptitudes necessary to do unskilled work, moderate limitations in seven abilities, and marked limitations in six abilities.  Specifically, Dr. Fellner opined that claimant had marked limitations in: (1) maintaining attention for two-hour segments; (2) maintaining regular attendance and being punctual within customary, usually strict tolerances; (3) working in coordination with or proximity to others without being unduly distracted; (4) completing a normal workday and workweek without interruptions from psychologically-based symptoms; (5) performing at a consistent pace without an unreasonable number and length of rest periods; and (6) dealing with normal work stress.  She supported those opinions with this narrative:

> Due to high anxiety symptoms, cognitive fatigue and
> poor sustained attention patient [is] unable to
> maintain attention for tasks greater than 30 minutes,
> unable to tolerate even normal workplace stress, and
> unable to maintain pace or schedule without
> disruptions due to psychologic[al] symptoms.

Tr. 623.  With respect to functional limitations, Dr. Fellner opined that Hunt had: (1) moderate restrictions on her activities of daily living; (2) marked difficulties in maintaining both social functioning <u>and</u> concentration,

10

persistence or pace; and (3) four or more episodes of
decompensation, each of at least two weeks duration, over the
previous 12 months.  Finally, Dr. Fellner opined that Hunt would
miss more than four days of work each month because of her
mental impairments or treatment for them.

After the Social Security Administration ("SSA") denied
Hunt's applications for benefits, she received a hearing before
an Administrative Law Judge ("ALJ").  Subsequently, the ALJ
issued a decision that includes the following relevant findings
of fact and conclusions of law:

> 3.  The claimant has the following severe impairments:
> depression; anxiety; traumatic brain injury;
> fibromyalgia; narcolepsy; and bilateral carpal tunnel
> syndrome (20 CFR 404.1520(c) and 416.920(c)).
>
> . . . .
>
> 4.  The clamant does not have an impairment or
> combination of impairments that meets or medically
> equals the severity of one of the listed impairments
> in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
> 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925
> and 416.926).
>
> . . . .
>
> 5.  After careful consideration of the entire record,
> I find that the claimant has the residual functional
> capacity to perform light work as defined in 20 CFR
> 404.1567(b) and 416.967(b).  She is able to perform
> frequent balancing, and occasional stooping, kneeling,
> crouching, crawling, and climbing [of] ramps, stairs,
> ladders, ropes and scaffolds.  She is able to
> frequently handle/grasp bilaterally, and she must
> avoid all hazards, such as unprotected heights and
> dangerous machinery.  She is limited to simple,

unskilled work.  She is able to maintain attention and
concentration for two-hour increments throughout an
eight-hour workday, and she is able to sustain
occasional social interaction with coworkers,
supervisors and the general public.

. . . .

6.  The claimant is unable to perform any past
relevant work (20 CFR 404.1565 and 416.965).

. . . .

10.  Considering the claimant's age, education, work
experience, and residual functional capacity, there
are jobs that exist in significant numbers in the
national economy that the claimant can perform (20 CFR
404.1569, 404.1569(a), 416.969, and 416.969(a)).

Tr. 29, 31-32, 36, 37.

Based upon a response to a hypothetical question he posed

to a vocational expert ("VE") that incorporated the RFC recited

above, the ALJ determined that Hunt was able to perform the jobs

of assembler of plastic hospital parts, marker, and electric

accessories assembler.

After getting an answer to his first hypothetical question,

the ALJ asked the VE a second question that posited the

following additional limitations:

[T]he person is limited to only occasionally handling
and grasping; is only able to sit, stand, or walk in
any combination for no more than 46 [presumably "four
to six"] hours in any eight-hour workday; would
require at least two unscheduled breaks of
approximately 20 to 30 minutes; would be absent from
work approximately three [or] more times per month;
and would be off task approximately 15 to 20 percent
of the workday.  Would those additional limitations,

12

> either singularly or in combination, allow for . . .
> any . . . work that exists in significant numbers in
> the regional or national economy?

Tr. 74.  The VE testified that there were no jobs that a person
with those limitations could perform.  Finally, in response to
questions from claimant's counsel, the VE testified that there
were no jobs that a person could perform if he had any one of
the following limitations: (1) a need to take unscheduled five
minute breaks each hour; (2) "a marked limitation in the ability
to maintain concentration for two-hour segments," Tr. 76; (3) "a
marked limitation in the ability to maintain regular attendance
and be punctual within customary, usually strict tolerances,"
id.; (4) "a marked limitation in the ability to perform at a
consistent pace without an unreasonable amount and length of
rest periods," id.; (5) a 15 percent diminution, due to fatigue,
of "concentration and task completion, quality, independence,
and sustainability," Tr. 78; and (6) a 15 percent diminution in
"attendance, punctuality, and decision-making," Tr. 79.

### III. Discussion

#### A. The Legal Framework

To be eligible for disability insurance benefits, a person
must: (1) be insured for such benefits; (2) not have reached
retirement age; (3) have filed an application; and (4) be under
a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  To be eligible

13

for supplemental security income, a person must be aged, blind,

or disabled, and must meet certain requirements pertaining to

income and assets.  42 U.S.C. § 1382(a).  The question in this

case is whether the ALJ correctly determined that Hunt was not

under a disability from December 22, 2012, through July 11,

2014, which is the date of the ALJ's decision.

To decide whether a claimant is disabled for the purpose of

determining eligibility for either DIB or SSI benefits, an ALJ

is required to employ a five-step process.  See 20 C.F.R. §§

404.1520 (DIB) & 416.920 (SSI).

> The steps are: 1) if the [claimant] is engaged in
> substantial gainful work activity, the application is
> denied; 2) if the [claimant] does not have, or has not
> had within the relevant time period, a severe
> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the
> conditions for one of the "listed" impairments in the
> Social Security regulations, then the application is
> granted; 4) if the [claimant's] "residual functional
> capacity" is such that he or she can still perform
> past relevant work, then the application is denied; 5)
> if the [claimant], given his or her residual
> functional capacity, education, work experience, and
> age, is unable to do any other work, the application
> is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920).

The claimant bears the burden of proving that she is

disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  She

must do so by a preponderance of the evidence.  See Mandziej v.

14

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).  Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) [claimant]'s
> subjective claims of pain and disability as supported
> by the testimony of the [claimant] or other witness;
> and (3) the [claimant]'s educational background, age,
> and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

B. Hunt's Claims

Hunt challenges the ALJ's decision on multiple grounds, but

this claim is dispositive: the ALJ erred in his consideration of

the opinions that Dr. Nelson expressed in his Fibromyalgia

Medical Source statement and that Dr. Fellner expressed in her

Mental Impairment Questionnaire.

Under the applicable regulations, the SSA, and by extension

an ALJ, is obligated to evaluate every medical opinion a

claimant submits.  See 20 C.F.R. §§ 404.1527(c) & 416.927(c).

Medical opinions, in turn,

> are statements from physicians and psychologists or
> other acceptable medical sources that reflect
> judgments about the nature and severity of [a
> claimant's] impairment(s), including [her] symptoms,
> diagnosis and prognosis, what [she] can still do
> despite [her] impairment(s), and [her] physical or
> mental restrictions.

20 C.F.R. §§ 404.1527(a)(2) & 416.927(a)(2).  As a general

matter,

> the greatest weight should be placed on opinions from
> treating sources, with less weight placed on opinions
> from medical sources who merely examine a claimant,
> and the least weight of all on opinions from medical
> sources who have neither treated nor examined a
> claimant.

Jenness v. Colvin, No. 15-cv-005-LM, 2015 WL 9688392, at *6

(D.N.H. Aug. 27, 2015) (quoting McLaughlin v. Colvin, No.

14-cv-154-LM, 2015 WL 3549063, at *5 (D.N.H. June 8,

2015)).

In addition to outlining the general principle stated

above, the SSA regulations further provide that

> [i]f [an ALJ] find[s] that a treating source's opinion
> on the issue(s) of the nature and severity of [a
> claimant's] impairment(s) is well-supported by
> medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent with the
> other substantial evidence in [the claimant's] case
> record, [the ALJ] will give it controlling weight.

20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2).  When an ALJ does

not give controlling weight to a treating source's opinion, he

must still determine the amount of weight to give that opinion

by considering: (1) the length of the treatment relationship and

the frequency of examination; (2) the nature and extent of the

treatment relationship; (3) the supportability of the opinion;

(4) the consistency of the opinion with the record as a whole;

(5) the medical specialization of the source offering the
opinion; and (6) any other factors that may support or
contradict the opinion.  See 20 C.F.R. §§ 404.1527(c)(2)-(6) &
416.927(c)(2)-(6).  Indeed, "[i]n many cases, a treating
source's opinion will be entitled to the greatest weight and
should be adopted, even if it does not meet the test for
controlling weight."  Social Security Ruling 96-2p, 1996 WL
374188, at *4 (S.S.A. July 2, 1996).

In any event, an ALJ must "always give good reasons . . .
in [his] notice of . . . decision for the weight [he] give[s] [a
claimant's] treating source's opinion."  20 C.F.R. §§
404.1527(c)(2) & 416.927(c)(2).

> To meet the "good reasons" requirement, the ALJ's
> reasons must be both specific, see Kenerson v. Astrue,
> No. 10-CV-161-SM, 2011 WL 1981609, at *4 (D.N.H. May
> 20, 2011) (citation omitted), and supportable, see
> Soto-Cedeño v. Astrue, 380 F. App'x 1, 4 (1st Cir.
> 2010).  In sum, the ALJ's reasons must "offer a
> rationale that could be accepted by a reasonable
> mind."  Widlund v. Astrue, No. 11-cv-371-JL, 2012 WL
> 1676990, at *9 (D.N.H. Apr. 16, 2012) (citing Lema v.
> Astrue, C.A. No. 09-11858, 2011 WL 1155195, at *4 (D.
> Mass. Mar. 21, 2011), report and recommendation
> adopted by 2012 WL 1676984 (D.N.H. May 14, 2012).

Jenness, 2015 WL 9688392, at *6.

### 1. Dr. Nelson's Opinions

The ALJ gave little weight to the opinions expressed in Dr.
Nelson's Fibromyalgia Medical Source Statement.  Hunt claims
that the ALJ erred by failing to give controlling weight to

17

those opinions.  The court finds that the ALJ did not provide

sufficient justification for discounting Dr. Nelson's opinions.

The ALJ began his discussion of Dr. Nelson's opinions by

describing them:

> He opines that the claimant does not have the stamina
> and endurance to work "an easy job" for 8 hours per
> day, and that she would typically be off task at least
> . . . 25% or more of the workday.  In addition, he
> opines that she would likely be absent from work at
> least 4 or more workdays per month.

Tr. 35.  The ALJ explained his decision to give little weight to

Dr. Nelson's opinions this way:

> I have given his opinion regarding physical
> limitations and [claimant's] inability to work a full
> day little weight because it is not supported by the
> medical evidence of record or the claimant's reported
> daily activities.  Although she has persistent
> fibromyalgia symptoms, the records do not reflect
> disabling levels of pain.

Tr. 36.

As a preliminary matter, it is clear that the ALJ

addressed, and discounted, Dr. Nelson's opinions that claimant

lacked the stamina to work an eight-hour workday, and would be

off task up to 25 percent of any given workday, but it is not so

clear that the ALJ actually addressed Dr. Nelson's opinion that

claimant would be absent from work four or more days per month.

Given the ALJ's obligation to evaluate all medical opinions, see

20 C.F.R. §§ 404.1527(c) & 416.927(c), and the VE's testimony

that absence from work for more than three days per month would

18

preclude any employment, see Tr. 74, 81, the ALJ's apparent failure to address Dr. Nelson's opinion on that matter is a problem.

Turning to the opinions from Dr. Nelson that the ALJ clearly did evaluate, he mentioned both of the factors that must be considered when determining whether to give controlling weight to a treating source's opinion, i.e., supportability and consistency with the record as a whole.  See 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2).  The ALJ's consideration of each factor is problematic.

With regard to the first factor, supportability, the regulations provide that the opinion of a treating source such as Dr. Nelson is entitled to controlling weight if, among other things, it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2).  The ALJ stated, in a conclusory manner, that Dr. Nelson's opinion was not supported by the medical evidence of record.  However, the medical evidence documents both claimant's complaints to Dr. Nelson about multiple symptoms of fibromyalgia, including pain, stiffness, weakness, and paresthesia, and Dr. Bolding's determination that Hunt exhibited tenderness at more than 11 of the 18 fibromyalgia tender points.  Regarding that evidence, the court of appeals

has explained that "'a patient's report of complaints, or history, is an essential diagnostic tool' in fibromyalgia cases," Johnson v. Astrue, 597 F.3d 409, 412 (1st Cir. 2010) (per curiam) (quoting Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003)), and that "trigger points are the only 'objective' signs of fibromyalgia," id.

Beyond that, the ALJ wrote that Dr. Nelson's opinion was not supported because "the records do not reflect disabling levels of pain." Tr. 36. Pain, however, is only one symptom of fibromyalgia; there are others, such as "fatigue, a sense of weakness . . ., paresthesia, difficulty sleeping, and headaches." Stedman's, supra note 1, at 725. In his Fibromyalgia Medical Source Statement, Dr. Nelson indicated that Hunt had exhibited approximately 40 separate symptoms, signs, and conditions associated with fibromyalgia. While eight of them involved pain of some sort, Dr. Nelson noted other symptoms unrelated to pain that could have an effect on a person's ability to work, including: cognitive dysfunction ("fibro fog"), irritable bowel syndrome, muscle weakness, dizziness, frequent urination, insomnia, hearing difficulties, fatigue, depression, anxiety disorder, waking unrefreshed, numbness or tingling, constipation, nausea, nervousness, blurred vision, diarrhea, irritable bladder syndrome, chronic fatigue syndrome, panic

attacks, and hand tremor.  <u>See</u> Tr. 615-16.  In that same statement, Dr. Nelson opined that Hunt needed hourly unscheduled breaks due to pain, plus these other symptoms: muscle weakness, chronic fatigue, and paresthesia/numbness.  In short, under the circumstances of this case, even if the records do not reflect disabling levels of pain, that, alone, is insufficient to support a determination that Dr. Nelson's opinions were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2).

Turning to the second factor that must be considered when determining whether to give controlling weight to a treating source's opinion, <u>i.e.</u>, consistency with the record as a whole, the ALJ stated that Dr. Nelson's opinion was not "supported by . . . the claimant's reported daily activities."[6]  Tr. 36.  As with the ALJ's supportability analysis, his consistency analysis lacks any specificity; nowhere did he identify the reports he was talking about or identify information in such reports that was inconsistent with Dr. Nelson's opinion.

The record does include several reports on claimant's daily activities, but they do not support the ALJ's conclusion.  In

---

[6] While couched in terms of "support," the court interprets the ALJ's statement as a comment on consistency.

21

the Function Report – Adult that Hunt submitted to the SSA, she
was asked to describe what she did from the time she woke up
until going to bed, and she gave this response:

> This depends on how I feel.  I do some sewing, some
> reading, watch TV.  I must usually lie down to
> rest/sleep/alleviate pain in the afternoon from 1½ to
> 3 hrs.  I walk downtown most days (bank, market, mail)
> – less than ½ mile total.

Tr. 230 (emphasis added).  At her hearing, Hunt testified that
she: (1) has "extreme tiredness during the day," Tr. 62; (2)
"tend[s] to kind of zone out," id., in the afternoon; (3) often
has to sit quietly or "lay down for an hour, hour and a half,"
id., to recover from her fatigue; and (4) has to lie down on a
daily basis, sometimes more than once, see Tr. 68.  Plainly, Dr.
Nelson's opinion that Hunt lacked the stamina and endurance to
work an easy job eight hours per day is consistent with those
reports.

The Acting Commissioner offers the following defense of the
ALJ's evaluation of Dr. Nelson's opinions:

> [T]he ALJ did not merely cite a lack of objective
> findings . . ., the ALJ considered her subjective
> complaints of pain in determining her RFC.  However,
> the ALJ found that Plaintiff's symptoms were not as
> severe as alleged.

Doc. no. 11-1, at 10 (citation to the record omitted).  While
the ALJ did find claimant's statements about her symptoms to be
less than entirely credible, he did not identify his unfavorable

22

credibility assessment as a basis for discounting Dr. Nelson's opinion, and it is not for the Acting Commissioner to defend the ALJ's decision with rationales that the ALJ did not articulate. See Letellier v. Comm'r of SSA, No. 13-cv-271-PB, 2014 WL 936437, at *8 (D.N.H. Mar. 11, 2014) (collecting cases); see also Haggblad v. Astrue, No. 11-cv-028-JL, 2011 WL 6056889, at *13 (D.N.H. Nov. 17, 2011) (citing High v. Astrue, No. 10-cv-69-JD, 2011 WL 941572, at *6 (D.N.H. Mar. 17, 2011); Dube v. Astrue, 781 F. Supp. 2d 27, 36 n.15 (D.N.H. 2011); Laplume v. Astrue, No. 08-cv-476-PB, 2009 WL 2242680, at *6 n.20 (D.N.H. July 24, 2009) ("I cannot uphold the ALJ's decision based on rationales unarticulated in the record.")), R & R adopted by 2011 WL 6057750 (Dec. 6, 2011).

In sum, the ALJ's analysis of the factors identified in 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2), with respect to the opinions Dr. Nelson expressed in his Fibromyalgia Medical Source Statement, is inadequately specific and inadequately supported. Accordingly, the ALJ gave insufficient justification for determining that those opinions were not entitled to controlling weight. See Jenness, 2015 WL 9688392, at *6. That warrants a remand.

The court has thus determined that this matter must be remanded because of the way in which the ALJ considered

supportability and consistency, as those terms are defined in 20
C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2). The court now turns
to the supportability analysis that must be undertaken under
subsection (c)(3) of those regulations when a treating source's
opinion is not given controlling weight, but must still be
evaluated. According to that subsection of the regulations:

> The more a medical source presents relevant evidence
> to support an opinion, particularly medical signs and
> laboratory findings, the more weight we will give that
> opinion. The better an explanation a source provides
> for an opinion, the more weight we will give that
> opinion.

20 C.F.R. §§ 404.1527(c)(3) & 416.927(c)(3). To the extent that
the ALJ determined that Dr. Nelson's opinions did not meet that
standard of supportability, he was mistaken. In his
Fibromyalgia Medical Source Statement, Dr. Nelson specifically
identified claimant's symptoms, diagramed her tender point
sites, and referred to both Dr. Bolding's office note and the
FCE Summary authored by Colby and Bradshaw. In other words, Dr.
Nelson did present relevant evidence to support his opinions.
Whether Dr. Bolding's office note and the FCE Summary actually
support Dr. Nelson's opinions might be subject to legitimate
dispute. But it is for the ALJ, in the first instance, to
examine the evidence that Dr. Nelson cited in his opinion and
determine whether that evidence supports the opinion. In sum,
the manner in which the ALJ considered supportability under 20

C.F.R. §§ 404.1527(c)(3) & 416.927(c)(3) provides an independent ground for remand.

Before moving on from Dr. Nelson's Fibromyalgia Medical Source Statement, the court has one final observation, related to fibromyalgia, that may prove useful on remand.  To support his determination that claimant's statements about her fibromyalgia symptoms were not entirely credible, the ALJ said this: "Significantly, [claimant's] treating examining physician, Julia Bolding, opines that she does not feel that the claimant's fibromyalgia is a basis for disability."  Tr. 33 (citation to the record omitted).  In point of fact, Dr. Bolding's opinion was not limited to claimant's particular case of fibromyalgia but, rather, extended to fibromyalgia in general: "I do not consider fibromyalgia an appropriate reason for disability." Tr. 421.  That opinion, as opposed to an opinion on the functional effects of claimant's fibromyalgia, has no place in a proper consideration of Hunt's application for benefits.  Cf. Haggblad, 2011 WL 6056889, at *10 ("To the extent the ALJ adopted Dr. Axline's view that a claimant could never establish disability due to fibromyalgia, because of the lack of objective support for such a diagnosis, the ALJ was mistaken.").

2. Dr. Fellner's Opinions

The ALJ gave little weight to the opinions expressed in Dr. Fellner's Mental Impairment Questionnaire.  Hunt claims that the ALJ erred by failing to give great weight to those opinions. The manner in which the ALJ evaluated Dr. Fellner's opinions suffers from the same infirmities of his evaluation of Dr. Nelson's opinions, and provides another ground for remand.

To begin, while the ALJ began his discussion of Dr. Nelson's opinions by describing them, he did not do so for the opinions that Dr. Fellner expressed in her Mental Impairment Questionnaire, which complicates things from the outset.  Dr. Fellner, like Dr. Nelson, opined that Hunt would be absent from work more than four days per month due to her impairments.  But, while the ALJ at least acknowledged Dr. Nelson's opinion on this issue, he said nothing at all about Dr. Fellner's opinion on it. Thus, it is far from clear that the ALJ gave any consideration to Dr. Fellner's opinion on Hunt's likely absence from work.

Be that as it may, the ALJ described his evaluation of Dr. Fellner's opinions this way:

> I have given little weight to the opinion of Dr.
> Fellner because it is a conclusory opinion, with
> little evidence used to support the findings.  It
> appears that Dr. Fellner's treatment of the claimant
> has been limited.  Also, it is inconsistent with the
> treatment records of the claimant which do not show
> marked limitations in social functioning or
> maintaining concentration, persistence and pace.  The

claimant routinely socializes with others, and her
notes consistently show pleasant and cooperative
behavior.  In addition, while she may have reported
memory issues, there is no evidence to support marked
limitation in her ability to maintain concentration,
persistence and pace.  She is able to carry out her
daily activities independently, attend appointments
and engage in hobbies such as sewing, reading and
watching television.

Tr. 36.

The first sentence of the ALJ's evaluation of Dr. Fellner's

opinions calls them conclusory and refers to a lack of support.

But, it is not clear whether the ALJ was undertaking a

supportability analysis for the purposes of 20 C.F.R. §§

404.1527(c)(2) & 416.927(c)(2), which pertain to the controlling

weight analysis, or for the purposes of 20 C.F.R. §§

404.1527(c)(3) & 416.927(c)(3), which pertain to the weighing of

treating source opinions that have not been given controlling

weight.  Either way, the ALJ's determination that Dr. Fellner's

opinions lack support is unfounded.

With respect to support from "medically acceptable clinical

and laboratory diagnostic techniques," 20 C.F.R. §§

404.1527(c)(2) & 416.927(c)(2), which is necessary to entitle a

treating source's opinion to controlling weight, Dr. Fellner

completed her Mental Impairment Questionnaire less than a month

after she spent 90 minutes examining Hunt.  In the progress note

that resulted from that examination, Dr. Fellner described the

27

findings of a mental status examination she administered to

Hunt:

> Casually groomed with good hygiene.  Normal
> psychomotor activity.  Affect dysphoric, anxious, high
> arousal, prominent anger noted.  No expansiveness.
> Minor lability and reactivity noted.  No anhedonia or
> hopelessness.  Speech fluent, normal rate and volume.
> Some word fining difficulties.  No paraphasic errors.
> Alert.  Oriented.  Intelligence average.  <u>Quite
> distractible and poor sustained attention.  Cognitive
> fatigue prominent.</u>  . . .  No hallucinations,
> delusions, paranoia, or IOR.  No dissociation.  Some
> obsessional thinking.  Passive [suicidal ideation]
> without plan or intent.  No [homicidal ideation].
> Insight regarding her deficits and symptoms intact.
> Accepting treatment and supports.

Tr. 509-10 (emphasis added).[7]  Then, under the heading

"Treatment," Dr. Fellner offered the following observations

specific to each of three diagnoses:

> Depression . . . Depressive symptoms have been severe
> and disabling interfering with her ability to cope
> with stress and engage socially as well as make
> decisions.
>
> . . . .
>
> PTSD . . . Disabled by poor coping, emotional
> dysregulation with stressors, poor socialization and
> poor task performance.
>
> . . . .
>
> Brain injury . . . She has significant cognitive
> difficulties with poor sustained attention,
> disorganization in her thinking, sensitivity to
> cognitive fatigue and overstimulation and difficulty

---

[7] Dysphoria is "[a] mood of general dissatisfaction,
restlessness, depression, and anxiety; a feeling of
unpleasantness or discomfort."  <u>Stedman's</u>, <u>supra</u> note 1, at 599.

making decision[s].  These cognitive symptoms may be
exacerbated by her emotional problems and Narcolepsy,
but [I] suspect head injury plays a role as well.
Treatment of Narcolepsy has been of partial benefit
but still with significant residual symptoms and based
on prior functioning, she has shown a significant
deterioration in functioning since head injury across
life domains.

Tr. 510, 516.  Leaving aside Dr. Fellner's conclusions regarding

disability, which are entitled to no particular weight, see 20

C.F.R. §§ 404.1527(d)(1) & 416.927(d)(1), her observations do

link claimant's functional deficits to specific medical causes.

The ALJ did not question the validity of Dr. Fellner's

mental status examination.  Thus, her report on that examination

would appear to satisfy the supportability requirement of 20

C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2) with respect to Dr.

Fellner's opinion that claimant was "unable to maintain

attention for tasks greater than 30 minutes."  Tr. 623.  Such a

limitation, in turn, would preclude employment, according to the

testimony of the VE.  See Tr. 76.  In short, to the extent that

the ALJ determined that Dr. Fellner's opinion was not well-

supported for the purposes of the controlling weight analysis,

the court is not persuaded.

With respect to the supportability analysis that applies to

treating source opinions that are not given controlling weight,

the court is not persuaded by the ALJ's characterization of Dr.

Fellner's opinion as "conclusory."  Dr. Fellner provided her

opinion on a form provided by the SSA, and while that form consists of three sets of questions calling for answers in check boxes, each set of questions is followed by a space calling for a narrative explanation. Dr. Fellner, in turn, used each of those three spaces to provide a response that identified the specific diagnoses and/or symptoms that caused the limitations she ascribed to Hunt. The ALJ's characterization of Dr. Fellner's opinion as "conclusory" appears to be contradicted by this evidence. More to the point, to the extent that the ALJ determined that Dr. Fellner's opinion lacked support, for the purposes of 20 C.F.R. §§ 404.1527(c)(3) & 416.927(c)(3), that determination does not appear to be well founded.

Finally, there are also problems with the ALJ's discussion of consistency with the record as a whole, which is a factor in both the controlling weight analysis and the analysis that applies to treating source opinions that are not given controlling weight. The ALJ said that Dr. Fellner's opinion "is inconsistent with the treatment records of the claimant which do not show marked limitations in social functioning or maintaining concentration, persistence and pace." Tr. 36. But, the ALJ identified no specific treatment records that are inconsistent with Dr. Fellner's opinions and, as the court has noted above, Dr. Fellner's treatment records are consistent with her

opinions.  Moreover, Dr. Fellner's opinion regarding concentration, persistence and pace are largely consistent with the opinion offered by Dr. Jackson on this matter.  Accordingly, the court is not persuaded by the ALJ's handling of the consistency factor.

### 3. Hunt's Remaining Claims of Error

Along with the claims addressed above, Hunt claims that the ALJ erred in: (1) assessing her RFC; (2) evaluating the credibility of her statements about the symptoms of narcolepsy and fibromyalgia; and (3) framing the questions he posed to the VE.  Because the ALJ's RFC assessment and, by extension, the questions he posed to the VE, were both based upon an improper evaluation of the medical opinions, there would be no point in performing an analysis of those aspects of the ALJ's decision at this juncture.  With regard to claimant's challenge to the ALJ's credibility assessment, the court presumes that the SSA will bear in mind the court's concerns over the ALJ's reliance upon Dr. Bolding's skepticism about fibromyalgia as a diagnosis that can support a determination of disability.  Given that this matter is being remanded on other grounds, there is no need for any further consideration of Hunt's remaining claims.

### IV. Conclusion

For the reason described above, the Acting Commissioner's motion for an order affirming her decision, document no. 11, is denied, and Hunt's motion to reverse that decision, document no. 9, is granted to the extent that this matter is remanded to the Acting Commissioner for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).  The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge


December 5, 2016

cc:   Ruth Dorothea Heintz, Esq.
      Robert J. Rabuck, Esq.